Chief Judge Karnes, may it please the court, amid all the factual disputes here, the words of the police themselves stand out. Officer Butler says there was no purpose for the 13 additional tases on the ground. Officer Shealy says that Mr. Illich was not going anywhere when Officer Williams put 385 pounds on his back and the only reason he didn't tell him to get off was because he was his boss. As to the first statement that you quoted, that's really irrelevant to the objective test, is it not? I don't believe so. You're certainly right. So if the officer said it was required, that would be the end of it? No, but it shows that there was... There would be evidence that an objective officer would have concluded it would have been necessary? No, Your Honor. What it shows is that an officer who was on the scene, right on top of Mr. Illich when all of this was happening, himself believed there was no purpose for tasing him 13 times on the ground. That violates the basic principle... In underqualified immunity, the question is whether any reasonable officer could have believed, not whether one particular officer did believe. It sets up, I believe, a factual dispute about the justification... No, it doesn't. The facts are this happened at this time while this was happening. Who, what, where, when, and why. It doesn't... That one officer believes it was necessary is not a factual dispute. Well, at the very least, it violates the basic principle that force must be rooted in some law enforcement need. No, it doesn't. It just simply reflects what one officer subjectively thought about that. Now, I have been criticized before for arguing too long with attorneys. That's my position. I don't know how my colleagues feel about it. But the one thing I feel certain in this area of the law is it's objective test. It makes no more difference that an officer says, I thought it wasn't necessary, than if an officer says, I thought it was necessary. We determine what a reasonable officer could have believed was necessary. Yes, Your Honor. I merely mean to show that it's a remarkable concession for an officer on the scene to say that there was no purpose for 13 out of the 19 tases that were experienced here. But if we zoom out just a bit, there are six factual disputes which should have defeated summary judgment in and of themselves. Counsel, before you do that, I want you to talk about this concept of resisting. Because when I look at a lot of the 11th Circuit cases, it seems to indicate that additional force or tasing and different kind of law enforcement strategies are okay as long as we have a situation where someone is resisting. And I do, when I look at a lot of the facts, I don't see a lot of disputed facts about when he was resisting. So when you talk about facts, I think whether he's resisting or not, at least to me, is an important, maybe the most important facts that we have to apply here. You're right. And it was hotly disputed in this case. It's the predicate factual determination for whether qualified immunity should apply. The question as to whether Mr. Illich was actively resisting or whether he was simply struggling to breathe. And we have a few pieces of evidence on that. First of all, we have the testimony of the chief of police himself, who says that when someone is struggling to breathe on instinct, they will, quote, get into a position where they're trying to breathe. That's tab 14421. We also have this court's recognition. Do you need a statement of the police chief for that? No, you're right, Your Honor. The police chief wasn't there. He couldn't tell whether he was struggling to get out or struggling to breathe, did he? He was not there. But I think it reflects this court's wisdom in Oliver and Boynton that when a suspect is repeatedly tased, it can cause the body to tense, you lose muscular control. It's what the court called flopping in some of these cases. Also in Priester and in Stevens v. City of Butler, courts in this jurisdiction have rightly held that defensive force, resisting pain, is not the same as resisting arrest. And so that is a core factual dispute in this case. But back to Chief Judge Carnes' questions. Because we're looking at the subjective standard, how is a reasonable officer supposed to know whether someone is moving around because of trying to breathe versus resisting? And that's a problem in terms of the facts are someone is moving around, and that's undisputed. Yes, subjectively why they're moving around is certainly disputed, but how does that work with an objective standard? Sure. So I think there are objective material differences between active resistance, which connotes things like punching, head butting, being in a fight upright, as opposed to passive resistance, more subtle tensing, struggling to breathe, moving one's face to try to breathe or expand the lungs. Those are things that an officer could observe, and it is essentially a factual determination that was not fully resolved in this case. This is also a unique situation, I might just add, where the key witness who could have testified as to what happened here has been killed. This is the special situation the D.C. Circuit in Flythe addressed, where the only surviving witnesses are the defendants themselves. And the D.C. Circuit set out, and it also noted that every circuit in the country to have addressed this very special situation follows the same approach, and that courts should do three things in this sort of situation. The first is courts may not simply accept what could be a self-serving account by police. I think the D.C. Circuit didn't mean that. Certainly, it couldn't have meant it the way you're interpreting it. And I admit it's open to interpretation, but our law is not that if the police officers are the only surviving eyewitnesses, you somehow discount their testimony. And you somehow say, well, they could be lying because they have an interest to do so. We just had a whole en banc argument about whether you discount the testimony of somebody who has an interest in the case. And I will just tell you there is no authority whatsoever for that proposition. Your Honor, that was simply one of three steps. First step out. Okay. As far as I know, speaking only for myself, our circuit law, we have held time and time again. If you've got ten people testifying to one thing and you've got the only interested party testifying to the opposite thing, you've got to assume that that's a factual issue dispute. Here, you don't have the other ten people. You don't have one person. You have everybody in agreement that he was resisting and resisting following. Well, the other, I'm not sure I fully agree with that characterization of the facts, Your Honor, but the other two fly factors are what you're getting at, and they're very important. The second factor is that courts must carefully determine whether the officer's story is internally consistent and consistent with other known facts. The third is courts must look at circumstantial evidence. So you're right. It's not just inherently because there's an interested party. You have to look at the other inconsistencies, and there are several inconsistencies and disputes in this case. The second disputed fact, for example, is whether there were 385 pounds of weight placed on Mr. Illich after he was hogtied and fully secured. Officer Sheely, for example, says Mr. Illich, quote, was not going anywhere, and the only reason he didn't tell him to get off was, quote, because he's my sergeant. Officer Williams himself, when confronted with this testimony that he put all this weight on Mr. Illich after he was flex cuffed, said there was, quote, probably no reason for why he did that. That, again, violates the basic principle that force has to be justified by some law enforcement need. The third of many factual disputes here is the question of whether Mr. Illich was still cuffed when CPR was being performed and by the time the EMT arrived. There's a square clash of testimony here. EMT White says on tab 144.20 there were cuffs when she arrived. That prevented meaningful CPR. Officer Jenkins testifies the opposite on tab 81.3. On top of that, we also have three falsified affidavits, which are quite – raise a unique credibility question in this case. And unfortunately, such that it – Did the officers prepare those affidavits? We don't know, Your Honor. Don't know? How can it attack their credibility? We don't know specifically who – You impugn the misconduct of any of the attorney to the officers and put that before the jury and say, this attorney probably did something here he shouldn't have done, and you can use that to deliver a verdict against his clients? It does call into questionability – question the credibility of the defendants. This is reflected also in jury instruction. How does it call into credibility – how does it call into question the credibility of parties that we don't even know had anything to do with those affidavits? We do know that it was prepared by the defendants or their agents. No, no. We don't know it was prepared by the defendants. We know it was prepared by the attorney, do we not? The defendants weren't representing themselves. You really are arguing to us that in a case like this, the defendants go out and type up affidavits and get witnesses to sign them? I merely mean to say we don't know. Would you want us to remand to find out? That's not going to take long. You know how that remand is going to come out. There was evidence in the record that an employee of the Sheriff's Department went out to Ms. Ward's residence, had a pre-prepared statement. She tried to correct the statement. They said sign it, don't worry, we'll correct it later. It was knowingly submitted uncorrected. Is that employee a party in this case? We don't know. We don't know if the employee was a party? Probably not, Your Honor, but we don't know the exact identity of the person who went out to Ms. Ward's house. I'd also like to stress, in terms of the qualified immunity analysis here, the importance of proportionality and purpose. That is the entire premise of Graham, that greater force must be proportional to a greater need. Here again, I think the testimony of Officer Butler is critical. He said once the first tase dropped Mr. Illich, it had, quote, done its job. There was no need for additional tases, no. The only real effect would be to inflict pain. Yes, that's on page 108 to 111 of tab 144.15. By the time the 14 additional tases were used on Mr. Illich, the threat was seriously diminished, if not effectively over. This is a naked man who is obviously unarmed. Police recognized from the get-go that he was experiencing a mental crisis. He was surrounded by six highly trained law enforcement officers and faced death. Do you have facts in the record that show that he continued to be tased after he was still struggling to be handcuffed? After he was still struggling to be handcuffed? I think that even the police account says that. We also contend that he was handcuffed and continued to be tased. I guess the question is, do you have evidence in the record that show that he was tased after he was handcuffed? That is still in dispute. I think it's connected with the credibility problems. How is it in dispute other than your affidavit issue? So if a jury did not find credible the testimony about when the handcuffs were taken off for CPR purposes, they could also find not credible the testimony about when the handcuffs were put on. So if there's evidence to support a view different than a defendant officer testified to, there's a genuine issue of material fact as to everything that the defendant officer testified to. No, I don't mean to go that far. Why not? Yeah, sure. Where do you stop short of that? You said if there was a dispute about whether the handcuffs were on as to the CPR moment. Right. That's a credibility issue, and it undermines the question of whether he was tased after he stops struggling. It's essentially the same question as to when and how the handcuffs were put on. If the jury, because of the square factual dispute, I don't think there's any question about that, about when the handcuffs were taken off. If a jury were to disbelieve when that occurred, they could also readily find credibility problems about when the handcuffs were put on in the first place. And about anything else the officers say. There is an overarching credibility problem, but with specific to handcuffs, it's the same conduct. But the question is whether he was tased after he had the handcuffs on, not whether CPR was administered while he had the handcuffs on. I've told you my trouble. You've responded to it. I appreciate it. And you, of course, have your full two minutes and reply. Mr. Clements, eight minutes. May it please the court, my name is Fred Clements, and I represent the Appalachians from Lee County, Sheriff Jones, Deputies Mills, Jenkins, and Smith. To begin, I want to dispel a factual myth about Officer Butler's testimony. Officer Butler did not testify that there was no basis for use of the taser after Illich went to the ground. And to the contrary, he testified upon being asked was there any further reason, he testified, quote, he was still actively resisting. And your honors can find this in document 134-4, page 81, lines 6 through 8. What about the part of his testimony that your brother over there didn't necessarily quote but paraphrased? Is there anything to support that? To support, yes. If you read the testimony, which is actually on the page before that I cited, yes, in the ideal situation, when someone is tased and goes to the ground, then what you want to do is use that opportunity to secure the individual, which is what the officers did. Now, I'm asking you, is there anything to support his position that the officers said, I thought it was unnecessary to continue tasing him? In total, no, your honor. Well, in part, not in total, but in part. No, your honor. And it would be, and you can read for yourself on the two pages before what I cited and including his response. Now, in this case, Illich needed to be restrained. The record shows that he was a danger to himself. He was a danger to others. He had broken several laws. You have to be further restrained when he was already hogtied. Your honor, because there are two sets of counsel here, the co-counsel is going to address that because my clients are the ones who tasered. Okay. But to answer your question. You don't have to use your time for that. I'll ask him that question. Thank you, your honor. Now, moving to Deputy Mills' use of the taser, which the video has been provided, which at least presents a view through the eyes of the officer what the officers were having to deal with, is Deputy Mills was in a Draper v. Reynolds situation where he was alone with an individual who was unpredictable, who would not follow directions, who came toward him in an aggressive manner. You can hear that Deputy Mills warned him before he discharged the taser. This is a Draper v. Reynolds situation. The subsequent taser was after the flight began and after Mills observed him going toward a home, the door of another home. The last three incidences where the taser occurs is once they had gone to the ground and Deputy Mills is in what he describes as a fight for his life. Now, one of the things that is important before we leave the taser use of Deputy Mills is if you listen to what Deputy Mills says after the second taser use, when Illage first goes to the ground, Deputy Mills says, calm down, it's going to be okay, which is consistent with the testimony of what occurred at the War residence where the officers were described by Ms. War as being professional, telling them to calm down, and what she described as trying to keep him from injuring himself. And this is from Ms. War's deposition, not her affidavit. Now, moving to Deputy Mills' use of a taser, his initial use of a taser was after Mr. Illage had attempted to enter another residence and turned in an aggressive manner. Now, realistically, the number of discharges of the taser, 14 at that time, it's not an insignificant number, but the number itself doesn't make it constitutionally unreasonable. For example, in a similar set of circumstances in Hoyt v. Cooks, in dealing with an individual who was also in excited delirium, in attempting to cuff an officer, they discharged a taser 18 times in order to try to encourage compliance to be tased, which this court found in that case reasonable. Up to the time you're about to say the last round of tasing or one of the last rounds of tasing, there had only been one tasing in the prong mode, right? No, Your Honor. Are we talking about in this case or discussing Hoyt? This case. Yes, no, the discharges of the taser were all in prong mode. All of them? Yes, Your Honor. And there is a good explanation for this, you see, because it's in the record that Deputy Mills and Deputy Smith both noted that Illage would have been pretty much impervious to pain compliance techniques when they saw him climb across a barbed wire fence as if it wasn't there and drive stun mode of a taser is a pain compliance technique, which with the facts that they had would not have served their purpose of trying to restrain him as opposed to the probe mode, which will actually take over the neuromuscular system of a person, which could have assisted the officers in securing him. Well, apparently it didn't take over his neuromuscular system because he kept going. That's right, Your Honor, and that's when Deputy Smith set the taser down and proceeded to help them, the other two officers, in completing Illage's handcuff, which all the evidence in the record shows he set that taser down prior to the second handcuff being secured. Anything else? If Your Honors have no further questions. We don't. Mr. Gamble. Good morning, Your Honors. May it please the Court. My name is Chan Gamble and I represent the City of Phoenix City and its officers, Butler, Sheely, and Williams. Mrs. Callwood has brought three claims against my clients. The first is a failure to intervene in the tasing of Mr. Illage by Deputy Smith. The second is an excessive force claim where she claims that my clients, in concert with the Lee County deputies, her words piled on top of Mr. Illage while he was restrained and violated his Fourth Amendment rights. And then lastly is a failure to intervene claim and that use of force, the quote, piling on. Is there any evidence in the record, and I know that this question probably should go to your brother over there, but is there any evidence in the record that there were multiple officers on top of him at the same time? No, sir. The evidence, the undisputed evidence in the record is that after Illage hit the ground, Deputy Mills and Officer Butler both got on each side of Mr. Illage. At this time, Smith was still standing behind them. As Mr. Clements said, Mr. Smith laid down his taser, helped him complete the handcuffs behind his back. Mr. Smith then went to Illage's feet to control his legs. Next, Officer Williams arrives. Deputy Mills asks Williams to relieve him. By this point, he had already received a torn bicep muscle and would later be treated for exhaustion at the hospital, would be taken to the hospital and be treated. So Mills never reenters the fight. What did Williams do at that point? Williams took control of, second time today, an ASP baton, which Smith had placed in between the handcuffs in an effort to control the arms. Williams took control of that. He put one knee up towards the upper torso between the shoulders and then one knee towards the lower ribcage. His testimony and the testimony of Smith is that at all times his feet were on the ground and at the balls of his feet and at no time was his entire weight placed on Mr. Illage. So was Mr. Illage on the ground then, lying on the ground? Yes, Your Honor. I'm a little confused about that position. If somebody had their knee in his back, how could that person, the balls of that person's feet, both feet be on the ground? He was crouched over, Your Honor, like this. He wasn't completely on top of it. He didn't place all of his weight on top of Mr. Illage. He was more crouched on top of him than all of his weight on top of him. Butler then goes to Mr. Illage's feet. Smith takes a break from the fight because Officer Sheely arrives. So at no time are there multiple officers on top of Mr. Illage's back. The only evidence is that one officer had placed any weight on his back and that is Officer Williams. And that weight was on his back after he had been fully restrained and fully, to lack of a better word, hogtied at that point, correct? Correct. And a detail on the hogtie. There's a case that we've cited and the lower court discussed, which said it foreclosed Ms. Caldwell's claim, Lewis v. City of West Palm Beach, where they used a restraint specifically for that, a four-point restraint, which draws the hands close together and the feet close together, and then the hands and feet both together very closely in a hogtie or hobble restraint. Here, Deputy Jenkins brought three flex cuffs and they estimate it to be in the neighborhood of 12 to 18 inches. So we have three circles that connected the leg chain to the handcuffs. The leg chain is 18 inches long between the two cuffs. And then you have 12 to 18 inches of flex cuff to a handcuff. These are two sets of handcuffs. So there's 12 to 16 inches in between the hands. So there's a lot of movement back there. He's not drawn all the way tightly as Lewis was in the West Palm Beach case. Mr. Schnapper says that Sheely says the only reason that he didn't tell Williams to get off of him was because he was a sergeant. Well, that's not the full testimony. But I still don't have the answer to the question I don't believe of. Okay, you have someone who is hogtied. They're laying on the ground. They're not moving their arms and legs. They're totally restrained. Why is the knee on the back? The testimony of Sheely, and that's what I was going to, is that he continued to flop around. He would not calm down. He was a danger to himself. And that's Sheely's testimony, and that's also Mrs. Ward's testimony, is that he continued so much that he was a danger to himself and that the officers were only trying to calm him down. We're on a hard concrete surface. They've come up a set of four to five stairs. There are concrete statues and objects all around, and he continued to resist. He would not calm down. It's not as if once he was put in the hogtie position that you could just allow him to flop around on the ground and continue to hurt himself. That would be the claim then. Why, after restraining him, did you allow him to beat himself against the hard concrete or brick ground? Where is his head at this point? Is he face down? Is he side? How is his head? Yes, ma'am. Officer Williams says at all times his face was turned to the side, and at no time was his mouth blocked by anything, whether it's grass or the ground or dirt. His face was always turned to the side. If you all don't have any other questions. We don't. Thank you. We don't. Counsel, and I'll give you an extra minute because I'm going to ask you this. Yes. About the affidavits. Yes. The contradictory affidavits, whatever you want to call them. You asked the district court to strike those. We did. And the district court struck them. They did. And, therefore, didn't consider them because when you strike something, it's no longer in the record. Correct. And now you seem to be arguing the district court shouldn't have granted summary judgment because those affidavits created a credibility question that ought to create a genuine issue, a material fact, but they're not in the record because you asked the district court to take them out of the record. We're not arguing that the stricken affidavits create a factual dispute. We're arguing that they raise, unfortunately, raise an overarching question about credibility here. That's the same thing. There's no credibility issue beyond the summary judgment standard of genuine issue of material fact. I mean, they're either in the record at summary judgment or they're not. You asked the district court to take them out. It did so. And now you're saying the district court erred in deciding summary judgment in part because of the affidavits, which were no longer on the record because of your actions. I see it somewhat differently, Your Honor. I see it that a reasonable jury could have reason to doubt the testimony of at least one of the officers here. And in a case where all of the material testimony comes from an interested party and the only surviving party here, that is an important factor. So the affidavits make no difference to your argument and your position? No, I think they're critical. Well, then why did you ask the district court to take them out of the summary judgment record? Because they were clearly erroneous. Yeah, but they're relevant to your case, you're saying. And they create a genuine issue of material fact, you say. I think the court can both correct factual errors by striking factual errors in the affidavit and still acknowledge the credibility. Ask him to strike the affidavits, did you not? And he struck the whole affidavits. And he decided summary judgment on the record that you wanted him to decide it on, minus the things you wanted out of the record. And now you say he made an error because of things that you asked him to put out of the record. I have a real serious problem with that. I understand, Your Honor. Just to clarify one point, they only struck parts of the affidavit. If I might just zoom out briefly, I just want to stress two things. The parts he struck were the parts I misspoke. The parts he struck were the parts that you said were false. Correct. Okay. Same difference. Okay. And let's give you two more minutes back. I just want to make a few quick points a little bit more broadly. The first is that this case presents three independent grounds for reversal. You only have to rule for us on any one of them to send this case back to the district court. There's the question of factual disputes and all of your questions about exactly what happened, explain why summary judgment was inappropriate in a case like this. Secondly, there's the credibility question, which we just discussed. And third, there's the violation of clearly established law. Did all of this force, cumulative force, serve some pressing need or law enforcement purpose? I also want to stress that this is the most extreme taser case this circuit has ever seen. In terms of the number of tasers, 19, the number of officers involved, six, the duration of the tasers, 68 seconds. And when you put that up against the diminished need or diminished threat, it's hard for me to understand how it gets past a basic proportionality analysis. Finally, regardless of any argument I've made here today, I want to leave you with the testimony of the officers themselves, and I would direct you towards the testimony of Officer Butler. That's 144-15, particularly pages 80 to 81 and 110 to 111, where he says there was no purpose and this was just inflicting pain. Also, the testimony of Officer Sheely. That's tab 144-18 and pages 77 to 78, where he admits Mr. Illich was fully restrained by the time he was hogtied, face down on the ground, and Mr. Officer Williams put 385 pounds of weight on his back. Thank you. Does the officer say when Officer, I thought it was Williams, put 385 pounds on his back? I'm sorry. Does he say? Does the officer in his deposition testimony say when he was fully restrained when Officer Williams put 385 pounds on his back? Yes, he does. He says it was after the flex cuffs and the hog tying. You're adding to that that Officer Williams put 385 pounds on his back as opposed to what I understood some testimony to be. I see. The officer whose testimony you're citing didn't say that Officer Williams put all 385 pounds on the victim's back, did he? He didn't speak to the specific number of pounds. No, I'm sorry, Your Honor. I understand. All right. We'll take that case under submission and stand in recess until tomorrow. All rise.